UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MARUT PANCHITKAEW,

                                    Plaintiff,

            v.

NASSAU COUNTY, NASSAU COUNTY POLICE
DEPARTMENT, JOSEPH M. GAFFNEY, DANIEL J.
DANZI, DANIEL C. STELLER, JOHN T. HOLMES,
STEVEN SCHWARTZ, JOSEPH SALVATORE,
CRAIG CLARK, CHRISTINA COSENTINO,
NASSAU UNIVERSITY MEDICAL CENTER,
MAUREEN MOYNIHAN, EUGENE YAP, MANSI
SHAH, MUKESH SHAROHA and MARIA
VICTORIA AGARIN,

                                    Defendants.

**MEMORANDUM AND ORDER**

18-CV-00956 (LDH)(AKT)

---

LASHANN DEARCY HALL, United States District Judge:

Plaintiff Marut Panchitkaew brings the instant action against Nassau County, Nassau County Police Department, Joseph M. Gaffney, Daniel J. Danzi, Daniel C. Steller, John T. Holmes, Steven Schwartz, Joseph Salvatore, Craig Clark, and Christina Cosentino (together, "NCPD Defendants"); and Nassau University Medical Center ("NUMC"), Maureen Moynihan, Eugene Yap, Mansi Shah, Mukesh Sharoha, and Maria Victoria Agarin (together, "NUMC Defendants"), asserting claims for unlawful entry, excessive force, unreasonable seizure, malicious prosecution, free speech retaliation, equal protection violations, due process violations, and *Monell* liability pursuant to 42 U.S.C. § 1983 and the New York State Constitution. Defendants[1] move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment to dismiss Plaintiff's third amended complaint in its entirety.

---

[1] On April 22, 2020, Moynihan filed a letter indicating that she joins in the motion filed by NUMC Defendants and all arguments advanced by NUMC Defendants apply with equal force to Moynihan.  (ECF No. 163.)

**UNDISPUTED FACTS[2]**

Sometime prior to January 2016, Plaintiff complained to the Nassau County Police Department Internal Affairs Bureau ("IAB") of police corruption at the Eighth Precinct.  (*See* Pl.'s Aff. Opp. NCPD Defs.' Mot. Summ. J. ("Pl.'s NCPD 56.1 Opp'n")  ¶ 2, ECF No. 180-4.)  Plaintiff is Asian and refers to himself as a "minority."  (Pl.'s Mem. L. Supp. Opp,'n NUMC Defs.' Mot. Summ. J. ("Pl.'s NUMC Opp'n") 24, ECF No. 160-7; May 5, 2020 Decl. Ben-Sorek ("Ben-Sorek Decl."), Ex N at 94:19–21, ECF No. 173-13.)  Defendants Steller and Danzi were assigned to the IAB.  (Pl.'s NCPD 56.1 Opp'n  ¶ 1.)  In January 2016, Steller and Danzi visited Plaintiff's home to speak with Plaintiff about his allegations.  (*Id.* ¶ 5.)  During that visit, Plaintiff stated that his phones were tapped, his computer and appliances were bugged, and that he was being followed.  (*Id.* ¶ 7.)  According to Plaintiff, Steller and Danzi warned Plaintiff not to file a complaint with the FBI and threatened to throw him in a "psychward" if he did not comply.  (*Id.* ¶¶ 8–9.)

On February 17, 2016, Plaintiff called Steller, and Steller recorded the conversation (the "Recording").  (*Id* ¶ 14; Ben-Sorek Decl., Ex. I at 40:8–10; 60:10–22.)  Throughout the conversation, Plaintiff indicated that his phone had been tapped, his email hacked, and he discussed his belief that there was conspiracy against him involving police officers and his neighbors.  (2/17/16 Recording at 2:01-2:10, 4:20-4:25, 7:10-7:15, 13:40-12:46, 13:40-12:46.[3])

---

[2] The following facts are taken from the parties' statements of material facts pursuant to Local Rule 56.1 and annexed exhibits.  Unless otherwise noted, the facts are undisputed.

[3] On March 24, 2020, in support of his opposition to NCPD Defendants' motion for a pre-motion conference on an anticipated motion for summary judgment, Plaintiff requested leave to file certain electronic exhibits, including the Recording, via CD, which the Court granted.  (ECF No. 168; 5/8/20 Order.)  Plaintiff's 56.1 statement cites frequently to the Recording.  (*See, e.g.,* Pl.'s NCPD 56.1 Opp'n ¶ 2.)  On March 24, 2021 the Court requested that a copy of the Recording be reproduced by NCPD Defendants as the Court never received Plaintiff's CD, and NCPD Defendants provided the courtesy copy as requested.  (March 24, 2021 Order; ECF No. 190.)  Subsequently, the Court located the CD submitted by Plaintiff, and has considered all of Plaintiff's evidence in deciding the instant motions.  A copy of the Recording is on file with chambers.

Plaintiff also stated that he was "running back" to his home-country of Thailand and later, that he was "planning to go back". (*Id.* at 9:06–9:45, 16:00–16:20.) At one point, Plaintiff stated that he believed he needed to seek psychiatric help, although he did not want to seek it that day and unequivocally did not want a police officer to accompany him to the doctor. (*Id.* at 16:40–17:00, 17:40–18:00, 18:30–18:45, 19:15–19:22.) At the end of the conversation, Plaintiff stated that Steller would one day see that Plaintiff would get shot and killed by a police officer. (*Id.* at 19:58–20:22.) Steller maintains that he believed Plaintiff to be threatening "suicide by cop." (*See* Ben-Sorek Decl., Ex. I at 80:16-81:7.) After this phone conversation, Steller contacted the local police precinct and requested that police personnel and an ambulance be dispatched to Plaintiff's residence to transport Plaintiff to NUMC because Plaintiff was a danger to himself. (Pl.'s NCPD 56.1 Opp'n ¶ 19; Ben-Sorek Decl., Ex I at 109:3-6, 112:7-15, ECF No. 173-8.) Gaffney, Schwartz, Salvatore, Clark, and Cosentino were the law enforcement members and medical personnel who arrived at Plaintiff's house. (Ben-Sorek Decl., Ex. C., ECF No. 173-3.[4]) Holmes is the supervising officer who signed the NCPD's Case Summary, which was prepared by Schwartz. (*See id.*)

When law enforcement and medical personnel arrived at Plaintiff's house, he was found hiding in a closet. (Pl.'s NCPD 56.1 Opp'n ¶ 24.) According to the patient care report completed by Cosentino, one of the medical personnel at the scene, Plaintiff was "very confused and paranoid," "talking about organized crime" regarding the police, FBI and the White House, and stated that he was on "44 different watch lists and that the police were going to assassinate him." (*See* Ben-Sorek Decl., Ex. D[5]; May 4 2020 Decl. Eric Broutman ("Broutman Decl."), Ex.

---

[4] While the NCPD's Case Summary does not list Gaffney as being present at the scene, the parties are in agreement that Gaffney was present. (Mem. L. Supp. NCPD Mot. Summ. J. ("NCPD Defs.' Mem.") 13, ECF No. 175; Pl.'s Mem. L. Supp. Opp'n NCPD Defs.' Mot. Summ. J ("Pl.'s NCPD Opp'n") 5, ECF No. 177.)

[5] This exhibit was filed under seal and is on file with Chambers.

1 at NUMC0023-24, ECF No. 158-1.)  Plaintiff was then transported to NUMC.  (NUMC Defs.'

56.1 Statement ("NUMC Defs.' 56.1") ¶ 1, ECF No. 159-1;.)

In the NUMC emergency room, Plaintiff was observed by Drs. Shah and Sharoha.

(NUMC *Id.* ¶ 6.)  In Plaintiff's initial conversation with Dr. Shah, Plaintiff stated that he had

contacted IAB because the NCPD was tapping his phone, and Plaintiff also stated that he has

significant credit card debt, and that the FBI was "involved."  (*See* NUMC Defs.' 56.1 ¶ 3; Pl.'s

Aff. Opp. Defs' Mot Summ. J. 56.1 ("Pl.'s NUMC 56.1 Opp'n") ¶ 3, ECF No 160-10; Broutman

Decl., Ex. 1 at NUMC0041.)  He began wailing in pain and lying on the floor saying his neck

was in pain.  (*Id.*)

Subsequently, Plaintiff was reported as pacing the psychiatric emergency unit, inducing

vomiting, screaming, and behaving in an "bizarre and inappropriate" manner, a characterization

to which Plaintiff objects.  (*See* NUMC Defs.' 56.1 ¶ 5; Pl.'s NUMC 56.1 Opp'n ¶ 5; Broutman

Decl., Ex. 1 at NUMC0042.)  When Plaintiff could not be calmed down verbally, he was given a

single dose of psychiatric medication via injection.  (*Id.*)  Drs. Sharoha and Shah diagnosed

Plaintiff as suffering from a psychotic disorder.  (NUMC Defs.' 56.1 ¶ 7; Pl.'s NUMC 56.1

Opp'n ¶ 7.)  Their diagnosis was based upon Plaintiff presenting as out-of-touch with reality,

thinking that his phones were tapped, and that multiple agencies were "after [him]."  (*Id.*;

Broutman Decl., Ex. C at 15:13–23, ECF No. 158-5.)  Based on this diagnosis, Drs. Sharoha and

Shah concluded that Plaintiff was a potential danger to himself or others and needed to be

admitted involuntarily to the hospital pursuant to New York Mental Hygiene Law § 9.37.

(NUMC Defs.' 56.1 ¶ 8.)  Plaintiff was transferred to the psychiatric unit, where Dr. Agarin

became his treating psychiatrist.  (*Id.* ¶ 9.)  Dr. Agarin reviewed Plaintiff's medical records and

spoke to Plaintiff, who she deemed to be paranoid.  (*See* Broutman Decl., Ex. D at 16:11–17:7,

ECF No. 158-6.)  Dr. Agarin diagnosed him with brief Reactive Psychosis, and agreed with Drs. Saroha and Shah's conclusion that Plaintiff required involuntary hospitalization.  (NUMC Defs.' 56.1 ¶ 11.)  Plaintiff was subsequently given antipsychotic oral medication.  (NUMC 56.1 ¶ 13-14; NUMC0012-13.)  NUMC Defendants maintain that Plaintiff was cooperative with treatment.  (*Id.*)  Plaintiff disputes that he voluntarily accepted the medication, and states that he was injected with medication numerous times without his consent.  (Pl.'s NUMC 56.1 Opp'n ¶¶ 13–14.)  Plaintiff was discharged from NUMC two days later, on February 19, 2016, because he was no longer deemed to be a danger to himself or others.  (NUMC Defs.' 56.1 ¶ 15.)

Sometime after he was discharged, Plaintiff "notif[ied] the FBI for help."  (*See* Pl.'s NCPD 56.1 ¶ 52, ECF No. 180-5.)  Plaintiff contacted the FBI office in Bangkok, Thailand after his involuntary commitment at NUMC to report that the "local cops were conspiring against him."  (Pl.'s Decl. Opp'n NUMC Summ. J. ("Panchitkaew NCPD Decl."), Ex. F at 1, ECF No. 179-9.)  And, in April and May 2017, he sent a series of emails to the FBI Bangkok office reporting purportedly false allegations made against him by NCPD officers.  (*Id.* at 2–18.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] are entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330–31 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim.  *Celotex Corp.*,

477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat

summary judgment only by producing evidence of specific facts that raise a genuine issue for

trial. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d

93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movant and draw all

justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do

more than merely assert conclusions that are unsupported by arguments or facts. *BellSouth*

*Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

"It is well established that the submissions of a pro se litigant must be construed liberally

and interpreted to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of*

*Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and emphasis omitted),

including when facing a summary judgment motion, *Jorgensen v. Epic/Sony Records*, 351 F.3d

46, 50 (2d Cir. 2003). Nevertheless, the "application of this different standard does not relieve

plaintiff of his duty to meet the requirements necessary to defeat a motion for summary

judgment." *Id.* at 50 (internal quotation marks omitted).

## DISCUSSION

### I. NCPD Defendants

#### A. Unreasonable Seizure

The Fourth Amendment protects against unreasonable searches and seizures, including

where the seizure is due to an individual's mental illness. *Myers v. Patterson*, 819 F.3d 625, 632

(2d Cir. 2016) ("[Fourth Amendment] protection adheres whether the seizure is for purposes of

law enforcement or due to an individual's mental illness."). To handcuff and detain an

individual for mental health reasons, an officer must have "probable cause to believe that the

person presented a risk of harm to [her]self or others." *Id.* (quoting *Kerman v. City of New York*,

261 F.3d 229, 237 (2d Cir. 2001)); *see also Green v. City of New York*, 465 F.3d 65, 83 (2d Cir.

6

2006) ("[I]n order to constitutionally seize a person to transport him to a hospital, the person must be dangerous, presumably to himself or others); N.Y. Mental Hyg. Law § 9.41 ("Any . . . police officer . . . may take into custody any person who appears to be mentally ill and is conducting herself in a manner which is likely to result in serious harm to the person or others."). The law requires only "a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Bryant v. Steele*, 462 F. Supp. 3d 249, 260 (E.D.N.Y. 2020); *Mizrahi v. City of New York*, No. 15-CV-6084, 2018 WL 3848917, at *20 (E.D.N.Y. Aug. 13, 2018) (collecting cases). To determine whether probable cause existed to justify a mental health seizure, courts must look to "the specific observations and information available" at the time of the seizure. *Myers*, 819 F.3d at 633.

Critically, the "harm to self or others" standard is not met by evidence suggesting merely that the person is emotionally disturbed, mentally unwell, paranoid, or espousing conspiracy theories. *See id.* at 634 ("A person may be annoyed, uncooperative, and irrational without presenting a danger to herself or of violence to others."); *Bryant v. Steele*, 462 F. Supp. 3d 249, 261–62 (E.D.N.Y. 2020) (denying summary judgment on probable cause grounds where it was undisputed that plaintiff called the police and claimed that "unknown Haitians and Jamaicans" were threatening to kill him, that unknown people were surveilling him, and that he had multiple firearms); *Greenaway v. County of Nassau*, 97 F. Supp. 3d 225, 234 (E.D.N.Y. 2015) (finding that defendants "fail[ed] to show that engaging in 'bizarre and unreasonable' behavior, including stripping naked and rubbing paint on oneself inside one's own residence, is 'likely to result in serious harm to the person or others,'" even though plaintiff made "gestures that some officers interpreted as 'threatening'"); *Guan v. City of New York*, No. 18-CV-2417, 2020 WL 6688855, at *10 (S.D.N.Y. Sept. 18, 2020) (denying summary judgment on probable cause grounds where

defendants provided evidence that plaintiff was mentally unstable, but provided no evidence that plaintiff manifested homicidal or other violent behavior placing others at risk of serious physical harm).

          1.      Steller

NCPD Defendants do not contest that Steller participated in the mental health seizure even though he was not at the scene. For good reason. The law has long recognized that a police officer may be held liable for false arrest when he had reason to know that the false arrest was likely to occur. *See Escalera v. Lunn*, 361 F.3d 737 n.4 (2d Cir. 2004) (noting that a police officer can only be liable for a false arrest that occurs outside of his presence if he had reason to know that such a false arrest was likely to occur); *Rasin v. City of New York*, 2016 WL 2596038, at *9 (E.D.N.Y. May 4, 2016) (observing that a defendant officer may be found to be personally involved in a false arrest if the officer "personally participated in the events that constitute the basis for the alleged probable cause asserted by defendants as a defense to the false arrest charges against them"). That said, Defendants urge dismissal of the false arrest claim against Steller arguing that Steller's conduct was supported by probable cause. (*See* Mem. L. Supp. NCPD Defs.' Mot. Summ. J. ("NCPD Defs.' Mem.") 8–9, ECF No. 175.) The Court disagrees.

    NCPD Defendants point to the following facts about the phone call that they argue support a finding that Steller had probable cause to order Plaintiff's mental health seizure: (1) Plaintiff had a "more heightened" tone compared to when Steller met Plaintiff several weeks prior; (2) Plaintiff acted more manic than when Steller first met him; (3) Plaintiff continued making allegations that his phone was tapped; (4) Plaintiff stated that he was "going away"; (5) Plaintiff stated that Steller "was going to see that Plaintiff was going to get killed by a cop one day." (NCPD Defs.' Mem. 9.) Curiously, despite that Steller recorded the conversation between

8

himself and Plaintiff, (Ben-Sorek Decl., Ex. I at 40:8–10; 60:10–22), NCPD Defendants failed to offer the Recording as evidence.  Rather, they rely on Steller's deposition testimony regarding the phone call.  (*See* NCPD Defs.' Mem. 9.)  And now, the Court understands why.  Having listened to the Recording, the Court cannot find that as a matter of law Plaintiff was conducting himself in a manner which was likely to result in serious harm to himself or others.

In the Recording, Plaintiff does say that he is "going back," but that statement was first made in the context of him discussing his plans to return to his country of origin, Thailand. (2/17/16 Recording at 9:06–9:45, 16:00–16:20.)  Moreover, it is correct that Plaintiff states that he believed he will be killed by a police officer.  (*Id.* at 19:58–20:22.)  However, Steller's testimony that he believed Plaintiff to be threatening "suicide by cop" seems to be little more than a post-hoc rationalization that is not borne out by the Recording.  (*See* Ben-Sorek Decl., Ex. I at 80:16-81:7.)  Plaintiff did not mention in any way that he was planning on attracting the attention of the police or putting himself in harm's way, and he did not convey any inclination to interact with the police.  To the contrary, Plaintiff asked Steller several times not to send anyone from the local precinct to his house.  (2/17/16 Recording at 18:30–18:45, 19:15–19:22.)  A reasonable inference is that he was seeking to avoid interacting with the police.  These statements are simply not of the sort that have been found to support a finding that the plaintiff was making suicidal threats or demonstrated clear evidence of self-harm.  *Cf. Glass v. Mayas*, 984 F.2d 55, 57 (2d Cir. 1993) (finding probable cause where the officers received two reports that plaintiff was threatening another individual with a gun, where various witnesses described him as hostile, guarded, angry, suspicious, uncooperative, and paranoid, and where he had an extensive psychiatric history with multiple instances of hospitalization for psychiatric care); *Bayne v. Provost*, 2005 WL 1871182, at *8 (N.D.N.Y. Aug. 4, 2005) (finding probable cause

where a treating nurse informed officers that plaintiff had threatened suicide and had the means to commit suicide through ingestion of numerous prescription medicines).

Nevertheless, NCPD Defendants argue that Steller should be protected by qualified immunity.  (NCPD Defs.' Mem. 13–15.)  Qualified immunity shields a government officer from liability under § 1983 "if he had arguable probable cause' to arrest the plaintiff."  *Myers*, 819 F.3d at 632 (citation and quotation omitted).  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  *Id.* at 633 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)); *Mara v. Rilling*, 921 F.3d 48, 73 n.16 (2d Cir. 2019).

NCPD Defendants fail to cite to any caselaw or refer to specific facts that support finding of qualified immunity here.  Rather, after generally stating the qualified immunity standard, they state summarily that "it was objectively reasonable for [NCDP Defendants] to believe that their actions were lawful, considering clearly established law and the information they possessed."  (NCPD Defs.' Mem. 15.)  The Court disagrees.  For the reasons already discussed, the Court is unable to conclude as a matter of law that it was objectively reasonable for Steller to believe that Plaintiff was a danger to himself or that officers of reasonable competence could disagree.  Accordingly, Steller is not entitled to qualified immunity on the unreasonable seizure claim.

2.    Gaffney, Schwartz, Salvatore, Clark, and Cosentino

The collective knowledge doctrine shields an arresting officer from liability for false arrest if the officer relies on a fellow officer who vouches for probable cause.  *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) ("The collective knowledge doctrine provides that, for

the purpose of determining whether an arresting officer had probable cause to arrest, "where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.").  "[This] rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates."  *United States v. Valez*, 796 F.2d 24, 28 (2d Cir.1986).  The collective knowledge doctrine "*assist[s]* officers in establishing probable cause," and cannot be used "to impute bad faith to one member of an enforcement team on the basis of another member's knowledge."  *Savino*, 331 F.3d at 74 (2d Cir. 2003) (emphasis in original).  NCPD Defendants argue that Gaffney, Schwartz, Salvatore, Clark, and Cosentino had probable cause to arrest Plaintiff under the collective knowledge doctrine.  (NCPD Defs.' Mem. 11–13.)  The Court agrees.

After Steller received the phone call from Plaintiff, Steller contacted the local police precinct and requested that police personnel and an ambulance be dispatched to Plaintiff's residence to transport Plaintiff to NUMC.  (Pl.'s NCPD 56.1 Opp'n ¶ 19; Ben-Sorek Decl., Ex. I at 109:3–6.)  Steller indicated that the requirements of § 941 of New York Mental Health Law had been met, meaning that Plaintiff was conducting himself in a manner which is likely to result in serious harm to the person or others.  (Ben-Sorek Decl., Ex. I at 107:3–10)  On Steller's authority, officers from the Second Precinct and an ambulance were dispatched.  (*Id*. at 108:11– 109:24.)  Gaffney, Schwartz, Salvatore, Clark, and Cosentino—the law enforcement and medical personnel who responded to Plaintiff's house—relied upon Steller's directive and finding of probable cause.  (*See* Ben-Sorek Decl., Ex. C; *id.*, Ex. D ("Call came in from NCPD IAU stating [Plaintiff] called them and was yelling on the phone that the police were going to kill him so he was going to harm himself.").)

Of course, it is possible that probable cause can dissipate upon law enforcement's arrival at the scene. *See Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) ("We believe that under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause."); *see also Grice v. McVeigh*, 873 F.3d 162, 176 (2d Cir. 2017) (Parker, J., dissenting) (citing *Jocks* to argue that probable cause dissipated where officers continued detaining the plaintiff even after having "cleared him of any threat"). Here, upon law enforcement arriving at Plaintiff's house, Plaintiff was found hiding in a closet, and medical personnel observed that that Plaintiff was "very confused and paranoid," "talking about organized crime" regarding the police, FBI and White House, and stated he was on "44 different watch lists and that the police were going to assassinate him." (Pl.'s NCPD 56.1 Opp'n ¶ 24; Ben-Sorek Decl., Ex. D.) There was nothing to indicate that probable cause had dissipated. Accordingly, although the Court determined that there remains a genuine issue of material fact as to whether Steller had probable cause, Gaffney, Schwartz, Salvatore, Clark, and Cosentino permissibly relied upon Steller's representation that probable cause existed for the seizure, and are therefore shielded from any unreasonable seizure claim.

### 3.    Holmes

"It is well-settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). Supervisory personnel may be considered "personally involved" only if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the

violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). NCPD Defendants argue that Holmes was not personally involved in any constitutional deprivation. (NCPD Defs.' Mem. 15.) The Court agrees.

Here, Holmes is the supervising officer who signed off on the case summary prepared by Schwartz. (*See* Ben-Soren Decl., Ex. C.) Holmes verified that the form was completed and that the specific incident was classified properly. (Ben-Soren Decl., Ex. K at 14:17–15:10, 17:22– 18:17, ECF No. 173-10.) This conduct alone does not constitute personal involvement, and Holmes was not otherwise involved in Plaintiff's seizure. Accordingly, he is entitled to summary judgment.

### B.    Warrantless Entry and Excessive Force

While Plaintiff pleaded Fourth Amendment claims for excessive force and warrantless entry, NCPD Defendants failed to move on either of these claims specifically. (*See* Am. Compl. ¶¶ 28, 31, 32, 34, 70, ECF No. 128.) Rather, NCPD Defendants generally argue that there is no evidence of any personal involvement of Salvatore, Clark, Schwartz, Gaffney or Cosentino in any constitutional violation that allegedly occurred at Plaintiff's home. (NCPD Defs. Mem. 15- 16.) The Court disagrees, in part.

Plaintiff identifies that Clark was present in Plaintiff's home with a firearm, Clark dragged Plaintiff from a closet, and Gaffney ordered Plaintiff handcuffed. (Ben-Sorek Decl., Ex. N at 105:12-110:4, ECF No. 173-13.) According to Plaintiff, Salvatore also participated in Plaintiff's handcuffing, and another individual was present that had markings on his sleeve indicating he was a supervisor. (*Id.*) All of this testimony is admissible evidence that creates a material dispute of fact as to the personal involvement of Salvatore, Clark, Schwartz, and Gaffney, the law enforcement on the scene.

However, NCPD Defendants are correct that there is no evidence that Cosentino, the medical personnel, participated in any unlawful entry or excessive force against Plaintiff.  At Plaintiff's deposition, he stated that Cosentino never entered his home or was involved other than transporting him to the hospital.  (*Id.* 113:14-114:17.)  Accordingly, Cosentino is entitled to summary judgment on these claims.

### C.    First Amendment Retaliation[6]

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."  *City of Houston v. Hill*, 482 U.S. 451, 461 (1987).  To prevail on a free speech retaliation claim, a plaintiff must prove: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right."  *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).  This standard applies where a private citizen alleges that, in relation for criticizing actions of certain public officials, he was seized within the meaning of the Fourth Amendment.  *Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) (describing the reach of *Curley*).

Plaintiff's First Amendment retaliation claim fails on the third element.  Where, like here, a plaintiff threatens to file a complaint against a police officer, and subsequently files that complaint, the defendants' actions cannot be said to have effectively chilled the exercise of the plaintiff's First Amendment right.  *See Rogers v. Miller*, No. 16-CV-03610, 2019 WL 3429767, at *8 (E.D.N.Y. July 30, 2019) (granting summary judgment to defendants and concluding that

---

[6] Inexplicably, NCPD Defendants have failed to cite a single case or make any relevant legal argument as to why summary judgment should be granted on Plaintiff's First Amendment claim.  They make much of the irrelevant fact that Steller and Danzi never communicated with the FBI.  (*See* NCPD Defs.' Mem. 7.)  Nonetheless, a district court "shall dismiss" claims in an *in forma pauperis* action "at any time" where it is satisfied that the claim is "frivolous."  28 U.S.C. § 1915(e)(2)(B).  As Plaintiff is proceeding IFP, the Court has undertaken, at the expense of its own time and resources, to evaluate whether summary judgment on the First Amendment claim is warranted.  Were Plaintiff not proceeding IFP, this claim would survive due to NCPD Defendants' failure to adequately move on this claim.

plaintiff's speech was not effectively chilled where plaintiff continued to file complaints against police officers and participate in the investigation of those complaints even after the alleged retaliatory stop); *Richardson v. New York City Health & Hosps. Corp.*, No. 05-CV-6278, 2009 WL 804096, at *20 (S.D.N.Y. Mar. 25, 2009) (granting summary judgment to defendants where plaintiff filed a complaint against defendants at the NYPD after she was arrested because plaintiff has failed to demonstrate her speech was effectively chilled).  Plaintiff was subject to a mental health seizure in February 2016.  (Pl.'s NCPD 56.1 Opp'n ¶ 19.)  Plaintiff states that sometime after this, he "notif[ied] the FBI for help," which is supported by the FBI records, which indicate that he contacted the FBI office in Bangkok after his involuntary commitment at NUMC to report that the "local cops were conspiring against him."  (Pl.'s NCPD 56.1 Statement ¶ 52; Panchitkaew NCPD Decl., Ex. F at 1.)  And, in April and May 2017, he sent a series of emails to the FBI Bangkok office reporting purportedly false allegations made against him by NCPD officers.  (*Id.* at 2-18.)  Accordingly, his speech was not effectively chilled by any retaliatory action taken by any NCPD officer.

Plaintiff has put forth no allegations or arguments as to how NCPD Defendants' actions chilled the exercise of his First Amendment rights.  However, any argument he could make about his subjective belief that his First Amendment rights were chilled would be unsuccessful.  "[A]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Curley*, 268 F.3d at 73 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).  Accordingly, there is no genuine dispute of material fact as to Plaintiff's First Amendment claim, and NCPD Defendants are entitled to summary judgment.

### D.    Malicious Prosecution

The elements of a malicious prosecution claim are: "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination

15

of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017).  Here, no criminal proceeding was ever commenced against Plaintiff.  Accordingly, NCPD Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claim.

### E.    Equal Protection Claim

 "[N]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  The Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  To state an equal protection claim, a plaintiff must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination.  *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).  NCPD Defendants argue that Plaintiff's claim should fail as it lacks any basis.  (NCPD Defs.' Mem. 10.)  The Court agrees.

The only facts supporting Plaintiff's equal protection claim are that Danzi and Steller are white, and Plaintiff is not white.  (*See* Ben-Sorek Decl., Ex N at 94:19–21, ECF No. 173-13; Pl.'s NCPD Opp'n 18.)  Plaintiff has adduced no evidence of intentional discrimination. Accordingly, NCPD Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

## II.    NUMC Defendants[7]

### A.    Due Process Claims

NUMC Defendants argue that Plaintiff's failure to adduce any medical expert testimony is fatal to Plaintiff's due process claims related to involuntary hospital admission or medication.

---

[7] In his 56.1 Statement, Plaintiff conceded that he did not intend to bring any equal protection claim for racial discrimination against NUMC Defendants.  (*See* Pl.'s NUMC 56.1 Opp'n ¶ 19.)  Now in opposition, Plaintiff argues

(NUMC Defs.' Mem. L. Supp. Mot. Summ. J. ("NUMC Defs.' Mem.") 4–7, ECF No. 159.)  The Court agrees.

"An involuntary civil commitment is a massive curtailment of liberty, and it therefore cannot permissibly be accomplished without due process of law."  *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995) (internal quotations omitted).  Substantive due process does not permit the involuntary hospitalization of a person who is not a danger either to himself or to others.  *Id.*  Likewise, it is well-established that the Fourteenth Amendment protects the right of a competent person to refuse unwanted medical treatment.  *See, e.g.*, *Cruzan v. Dir, Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions.").

However, a doctor will not be liable under § 1983 for treatment decisions "unless such decisions are such a substantial departure from accepted judgment, practice, or standards as to demonstrate that she actually did not base the decision on such a judgment."  *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir.1996) (internal quotation and alteration omitted) (applying standard to claims regarding administration of medication); *see also Bolmer v. Oliveira*, 594 F.3d 134, 144 (2d Cir. 2010) (observing that § 1983 claim for involuntary commitment requires the commitment decision "be the product of criteria *substantially* below those generally accepted in the medical community.").  This is because such decisions "do[] not ordinarily involve matters within the layman's realm of knowledge."  *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398

---

that they should be liable for racial discrimination he purportedly suffered based on the conduct of the NCPD Defendants, "even though NUMC Defendants were not directly involved in any discrimination."  (Pl.'s NUMC Opp'n 24.)  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001).  In any event, Plaintiff has not established any discrimination on the part of NCPD Defendants.  Accordingly, there is no genuine dispute as to any material fact related to Plaintiff's equal protection claim against NUMC Defendants and it is dismissed.

17

F.3d 183, 190 (2d Cir. 2005) (internal citation omitted).  A plaintiff bears the burden of

producing competent evidence, typically in the form of expert testimony, regarding applicable

medical standards and the defendants' alleged failure to meet those standards.  *Aouatif v. City of*

*New York*, No. 07-CV1-302, 2019 WL 2410450, at *7–8 (E.D.N.Y. May 31, 2019), *aff'd*, 441 F.

App'x 24 (2d Cir. 2011);  *Kraft v. City of New York*, 696 F. Supp. 2d 403, 413 (S.D.N.Y. 2010)

(collecting cases), *aff'd*, 441 F. App'x 24 (2d Cir. 2011).

Here, it is undisputed that Plaintiff did not consult or retain an expert psychiatrist in this

case.  (*See* NUMC 56.1 ¶ 20; Pl.'s NUMC 56.1 Opp'n ¶ 20.)  This alone warrants dismissal of

Plaintiff's due process claims, as Plaintiff has adduced no evidence that NUMC Defendants'

actions in committing Plaintiff or administering medication were a substantial departure from

accepted judgment, practice, or standards.  *See Aouatif*, 2019 WL 2410450, at *9 (granting

summary judgment to defendants on due process claim where plaintiff failed to adduce any

evidence or expert testimony setting forth the accepted medical standards with respect to

involuntary hospital admission or how the medical professional defendant failed to satisfy such

standards); *cf. Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190 (2d Cir. 2005)

(observing that an expert may not be needed to determine whether a physician violated a

standard of proper care where a deviation is so clear and obvious it will be within the

understanding of the ordinary layman, such as where a dentist pulled a wrong tooth).

In opposition to NUMC Defendants' arguments regarding Plaintiff's failure to retain an

expert to opine in this case, Plaintiff fails to offer any legal argument for his omission.  (*See* Pl.'s

NUMC Opp'n.)  Plaintiff cites to Dr. Agarin's testimony that brief reactive psychosis is usually

dealt with in outpatient settings to argue that his involuntary commitment was not reasonable

here.  (*See* Pl's NUMC Opp'n 9; Pl's NUMC 56.1 Opp'n ¶ 42; *see also* Broutman Decl., Ex. D

18

at 24:19-25:10.)  However, without expert testimony, the Court has no basis to conclude that Dr. Agarin or any other doctor's treatment decisions were a substantial departure from accepted judgment, practice, or standards to warrant the denial of summary judgment.  Accordingly, NUMC Defendants' motion for summary judgment on Plaintiff's due process claim for involuntary commitment and the administration of medication without consent is granted and that claim is dismissed.[8]

### B.     First Amendment Claim

NUMC Defendants argue that Plaintiff failed to plead any First Amendment violation by NUMC Defendants and did not adduce any facts relevant to a First Amendment claim.  (NUMC Defs.' Mem. 4 n.1.)  In opposition, Plaintiff concedes that he did not plead a First Amendment claim as to NUMC Defendants but argues that he has a claim under the Free Exercise clause that he did not previously plead.  (Pl.'s NUMC Opp'n 11–12.)  A plaintiff, even when proceeding pro se, may not raise new claims for the first time in opposition to summary judgment.  *See Oyewo v. Lahood*, 515 F. App'x 10, 11 (2d Cir. 2013) (holding that a "[pro se plaintiff] has abandoned her alternative work schedule claim by raising it for the first time in opposition to [defendant's] motion for summary judgment"); *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) ("The district court did not err in disregarding allegations [pro se plaintiff] raised for the first time in response to [defendant]'s summary judgment motion.").  Moreover, Plaintiff has not

---

[8] It is not altogether clear from the third amended complaint whether Plaintiff pleaded a Fourth Amendment claim against NUCM Defendants.  (*See* Th. Am. Compl., ECF No. 138.)  In any event, given Plaintiff's pro se status, even if an unreasonable seizure claim was brought against NUMC Defendants, summary judgment would be granted to NUMC Defendants on that claim.  "A warrantless seizure for the purpose of involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is dangerous to h[im]self or to others."  *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003).  Like with a due process claim, Plaintiff would have to show that the NUMC Defendant's determinations fell substantially below accepted medical standards.  *Kraft*, 696 F. Supp. 2d at 416 (S.D.N.Y. 2010) (citing *Kulak*, 88 F.3d at 75).  Plaintiff's failure to produce expert testimony is fatal here as well.  *See Kraft*, 696 F. Supp. 2d at 416 (granting summary judgment to medical defendants where expert failed to conclude that the doctor defendants' determinations fell substantially below accepted medical standards).  Accordingly, NUMC Defendants are entitled to summary judgment on any Fourth Amendment claim.

adduced any admissible fact that supports a Free Exercise claim.  (*See* Pl.'s NUMC 56.1 Opp'n.)

Accordingly, NUMC Defendants are entitled to summary judgment on the First Amendment

claim.

## III.    *Monell*

Plaintiff has adduced no evidence as to any unconstitutional municipal policy.  Without

such evidence, a single incident, like the one alleged here, cannot form the basis for a *Monell*

claim.  *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("Proof of a single

incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless

proof of the incident includes proof that it was caused by an existing, unconstitutional municipal

policy, which policy can be attributed to a municipal policymaker.").  Accordingly, Nassau

County is entitled to summary judgment on Plaintiff's *Monell* claim.[9]

## IV.    New York State Constitutional Claim

"District courts in this circuit have consistently held that there is no private right of action

under the New York State Constitution where, as here, remedies are available under § 1983."

*Campbell v. City of New York*, No. 09-CV-3306, 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15,

2011) (collecting cases).  Because Plaintiff brought various claims under § 1983, he cannot assert

a separate cause of action under the New York State Constitution.  *See id.*  Plaintiff's claims

pursuant to the New York State Constitution are dismissed.

---

[9] A municipality may not be held liable for the acts of its employees, agents, or representatives under a theory of respondeat superior.  *See Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). Accordingly, Plaintiff's respondeat superior claim is dismissed.  Moreover, NCPD is not a suable entity and, therefore any claim against NCPD is also dismissed.  *See, e.g.*, *Allen v. New York*, No. 15-CV-3653 (JS) (AYS), 2015 WL 6507477, at *3 (E.D.N.Y. Oct. 27, 2015) (dismissing claims against police department because "[i]t is well-established that under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued").

## CONCLUSION

For the foregoing reasons, NCPD Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  The claim for unreasonable seizure against Steller and the claims for warrantless entry and excessive force against Salvatore, Clark, Schwartz, and Gaffney survive.  All other claims against NCPD Defendants are dismissed.  NUMC Defendants' motion for summary judgement is GRANTED and the claims against NUMC Defendants are dismissed.

SO ORDERED.

Dated:  Brooklyn, New York                    /s/ LDH
       March 31, 2021                         LASHANN DEARCY HALL
                                    United States District Judge